# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JERRY D. McGAHA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. CIV-17-1290-G |
| | ) |
| ORION SECURITY SOLUTIONS, L.L.C., | ) |
| | ) |
| Defendant. | ) |

## ORDER

Now before the Court is the Motion for Partial Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Orion Security Solutions, L.L.C. *See* Def.'s Mot. (Doc. No. 35). Plaintiff Jerry D. McGaha has responded. *See* Pl.'s Resp. (Doc. No. 43. Defendant has replied. *See* Def.'s Reply (Doc No. 47).

### BACKGROUND

Defendant hired Plaintiff as a Service Division Manager and Systems Specialist. According to Plaintiff, he performed his duties satisfactorily, but was terminated after he complained about violations of the Fair Labor Standards Act of 1938 ("FLSA"), as amended, 29 U.S.C. §§ 201 et seq.

Plaintiff brought suit on November 30, 2017, and alleged in his complaint that (1) Defendant failed to pay him "at the statutorily prescribed rate of one-and-one-half times the regular rate of pay for all hours worked in excess of forty (40) [hours] per week," Compl. (Doc. No. 1) ¶ 29; (2) Defendant illegally retaliated against him by discharging him after he reported Defendant's violation of the FLSA, *see id*. ¶¶ 33-37; and (3)

Defendant violated Oklahoma common law when it converted Plaintiff's personal property, *see id*. ¶¶ 38-41. In the instant motion, Defendant has challenged only Plaintiff's retaliation claim, arguing that Plaintiff was properly terminated because he disregarded office policies and procedures and failed to perform basic duties.

STANDARD OF REVIEW

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim. The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Id.*

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the movant carries this initial burden, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (quoting prior version of Fed. R. Civ. P. 56(e)); *see also* LCvR 56.1(c). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

251-52 (1986). Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or
- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A)-(B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

## UNDISPUTED FACTS[1]

Defendant "specializes in providing technical and physical security solutions to private-sector and public-sector clients." Compl. ¶ 7. Plaintiff was hired on May 7, 2015, as a Service Division Manager and Systems Specialist. *See* Def.'s Mot. Ex. 1 (Employment Offer for Jerry McGaha) (Doc. No. 35-1), at 1 (hereinafter, "Employment Offer"). "[T]he skills emphasized in [Plaintiff's] . . . résumé . . . were important for . . . performing

---

[1] All material facts relied upon in this Order are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to Plaintiff.

3

[necessary] job duties." Def.'s Mot. Ex. 2 (Deposition of Sean Crain) (Nov. 20, 2018) (Doc. No. 35-2) at p. 4, ll. 8-10 (hereinafter, "Crain's Dep.").[2]

These duties included "fix[ing] customer issues with access control, CCTV," and "servicing equipment out in the field." Pl.'s Resp. Ex. 1 (Deposition of Jerry McGaha) (Nov. 12, 2018) (Doc. No. 43-1) at p. 23, ll. 14-15 (hereinafter, "Pl.'s Dep."); *id.* at p. 30, ll. 16-17. Plaintiff was required "to maintain his [company-issued] vehicle . . . [,] to maintain his inventory of tools . . . [,] to . . . timely . . . execute service tickets which are basically a recollection of his work effort at a particular job site to enable . . . [Defendant] to bill a client[,] [and] to manage service calls." Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 8, ll. 7-13; *see also* Def.'s Mot. Ex. 1 (Employment Offer) at 1 ("As a Service Division Manager, . . . "[y]ou will be responsible for coordinating customer support related to their technical security systems, providing training, and supporting the other missions of the Service Division. As a Systems Specialist, you will be responsible for supporting the field operations teams with installation and configuration of security system management software and related hardware.").

During Plaintiff's employment, Defendant held weekly management meetings, which were attended by "the directors of each division and [Defendant's] . . . executive team." Pl.'s Resp. Ex. 2 (Crain's Dep.) (Doc. No. 43-2) at p. 22, ll. 13-14. Executive team members included Sean Crain, Defendant's president and chief executive officer, and Greg Vance, Defendant's chief operating officer. Also attending were Trey Bell, Service

---

[2] In citing to depositions, the Court uses CM/ECF's pagination rather than the page numbers of deposition transcripts.

4

Division Director, and Casey McLoud,[3] Service Division Manager. *See id*. at p. 22, ll. 15-24.

During the hiring interview, Crain "discuss[ed] . . . the opportunity [for Plaintiff] to either be a salaried employee that was exempt [from certain FLSA provisions] or an hourly employee . . . , since the abilities that [Plaintiff] . . . had and the job duties he had would qualify for either." Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 4, ll. 12-15. Plaintiff "chose the salary," *id*. at p. 4, l. 16, and negotiated an annual base pay of $65,000, *see id*. at p. 5, ll. 15-18. Plaintiff also discussed with Crain "about working excessive hours and being compensated." Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 6, ll. 18-19. *Compare* Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 5, ll. 1-4 ("I do not recall him discussing the overtime, that he was also authorized for overtime, but . . . I don't recall that part of the conversation, whether that happened or not"), *with id*. at p. 10, ll. 5-6 ("During his application process, when I was visiting with him, we discussed it.").

Payment of overtime compensation did not come up again until "late 2016, probably," Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 8, l. 21, when Plaintiff and his supervisor, McLoud, were "just talking about [their] . . . pay," *id*. at p. 8, l. 22. McLoud "complained a lot," *id*. at p. 8, l. 23, and Plaintiff and McLoud "had quite a few conversations about just pay and how much . . . [they] were working overtime," *id*. at p. 8, l. 24 to p. 9, l. 1. They "weren't talking as . . . supervisor and employee. [They] . . . were

---

[3] This individual is also referred to in the record as "Casey McCloud" and "Casey McLeod." *See* Pl.'s Resp.; Def.'s Mot.; Def.'s Reply. The Court uses the spelling found on the Disciplinary Action Form. *See* Pl.'s Resp. Ex. 7 (Doc. No. 43-7).

5

basically talking as friends." Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 4, ll. 16-18. *See also id.* at p. 4, ll. 18-19 ("he was blowing off steam and . . . I guess I was blowing off steam").

Sometime thereafter, either in March or April 2017, *see* Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 25, ll. 14-18, or in June or July 2017, *see id.* at p. 9, l. 21, Plaintiff saw a U.S. Department of Labor poster at Defendant's facility regarding the FLSA and overtime pay. *See* Pl.'s Resp. Ex. 9 (FLSA Information Poster) (Doc. No. 43-9). The poster reinforced what Plaintiff "already knew" and "confirmed that how [Defendant was] . . . paying and . . . had . . . classified [Plaintiff] was not right." Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 9, ll. 18-19; *id.* at p. 10, ll. 7-8; *see also id.* at p. 26, ll. 22-24 ("After I saw the sign . . . I knew positively that . . . they were paying illegally."). It was then that Plaintiff "probably . . . started complaining more than anything . . . ." *Id.* at p. 9, ll. 23-24. Plaintiff continued to discuss the matter with McLoud, and McLoud told Plaintiff that "he was going to . . . [Vance] to get [them] . . . some compensation." *Id.* at p. 12, ll. 21-22; *see also id.* at p. 38, ll. 13-14 (McLoud "did tell me, on a couple of occasions, that he ha[d] talked to Greg.").

Plaintiff also went to Service Division Director Bell.[4] *See id.* at p. 27, l. 9. Bell, however, "never said really much back," *id.* at p. 37, ll. 23-24, and "really didn't give [Plaintiff] . . . any answers, one way or the other," *id.* at p. 37, ll. 24-25. Although Bell did tell Crain about his discussions with Plaintiff regarding overtime, Crain described Bell's

---

[4] Plaintiff cannot "recall exactly when th[e] date was that [he] . . . talked to . . . Bell about [overtime pay] . . . ." Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 5, ll. 14-15.

discussions as "nothing more than passing about how it would be nice to make overtime." Pl.'s Resp. Ex. 2 (Crain's Dep.) (Doc. No. 43-2) at p. 25, ll. 23-25.

Plaintiff does not "recollect" when he first formally notified "a supervisor that [he] . . . felt like [he was] . . . supposed to be paid overtime." Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 9, ll. 4-5.[5] But despite the lack of responses and answers from McLoud[6] and Bell, and even though he was aware of Crain's "open-door policy," *see id*. at p. 6, l. 12 to p. 7, l. 5; *id*. at p. 10, ll. 8-14, Plaintiff took no further action. *See* Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 7, ll. 16-25.[7]

"[T]hree or four months" before he was terminated in September 2017, Plaintiff met with Crain, Vance, McLoud, and Bell. Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 20, l. 15. According to Plaintiff, he and the others discussed "what [he] . . . was going

---

[5] *But see id*. at p. 3, l. 25 to p. 4, l. 5 ("Q So can you tell me . . . when the first time you told any supervisor . . . that you thought you were entitled to overtime pay? A I can't tell you the exact dates, no. Probably late 2016, and . . . in just a conversation with Casey.").

[6] Plaintiff cannot "recall" if McLoud "report[ed] back to" him, Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 5, ll. 4-6, and could not "recall" when he next brought up the issue with either McLoud or Bell, *see id*. at p. 5, ll. 7-10.

[7] Although Plaintiff socialized with Crain by regularly attending bowling outings with him, *see* Def.'s Mot. Ex. 5 (Declaration of Greg Vance) (Doc. No. 35-5) ¶ 7 (hereinafter, "Vance's Decl."), and talked with Crain "about other things" like "bowling . . . from time to time," Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 18, ll. 14-15, Plaintiff did not discuss "work-related concern[s]," *id*. at p. 18, l. 16, with Crain and did not take advantage of Crain's "open-door policy" because Plaintiff "[d]idn't feel like [Crain] . . . would care about it." Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 7, ll. 1-2. Plaintiff did, however, feel sufficiently comfortable with Vance to approach him "several times to request loans of money from [Defendant]," Def.'s Mot. Ex. 5 (Vance's Decl.) (Doc. No. 35-5) ¶ 4, to which requests Vance agreed, *see id*., Plaintiff further asked for, and received, permission to use Defendant's "corporate credit card to purchase a washer and dryer." *Id*. ¶ 5. Vance also, at Plaintiff's request, caused Defendant "to donate some used computer equipment to the school where [Plaintiff's] . . . girlfriend taught." *Id*. ¶ 6.

7

through," *id.* at p. 21, ll. 11-12, "with [his] . . . divorce and everything," *id.* at p. 21, ll. 13-14. Bell "confirmed that they[ ] had [had] no more problems from [Plaintiff] . . . since [a] write-up," *id.* at p. 21, ll. 19-20, in January 2017 regarding his tardiness. *See* Pl.'s Resp. Ex. 7 (Disciplinary Action Form).[8]  The others "may have said something about [Plaintiff's] . . . performance, but . . . no examples were ever given . . . about any type of performance issues." Pl.'s Resp. Ex. 1 (Pl.'s Depo) (Doc. No. 43-1) at p. 22, ll. 8-11. Plaintiff "ha[d] no idea" why the meeting, which he described as "pretty . . . short," was held. *Id.* at p. 21, l. 24; *id.* at p. 21, l. 21.[9]

Defendant's recollection of the meeting and its purpose differs. According to Defendant, Crain and the others met with Plaintiff for a "counseling session," Pl.'s Resp. Ex. 2 (Crain's Dep.) (Doc. No. 43-2) at p. 2, l. 5, because there had "begun to be a series of concerns expressed from [Plaintiff's] . . . management." Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 11, ll. 2-3. Crain knew "that there were some personal events

---

[8] Plaintiff received a verbal warning as indicated on the Disciplinary Action Form signed on January 16, 2017, by Plaintiff, Vance, and McLoud. *See* Pl.'s Resp. Ex. 7 (Disciplinary Action Form) (Doc. No. 43-7). The form described the "behavior" as:

> Arriving late to work on Monday, January 16, 2017 at 0821 hrs, this infraction is in violation of the 2016 Employee Review which states that all Service Division Teammembers are expected to be at work at 0800 hrs, Unless directed otherwise by Service Division Management.

*Id.* at 1. Plaintiff was advised that the "next action step if [the] problem continues," *id.* (capitalization deleted), would be "[a] written warning, leading up to, but not limited to termination," *id.*

[9] Although the meeting occurred after he and McLoud had first talked about overtime pay, there is no evidence that Plaintiff raised the issue with Crain, Vance, McLoud, and Bell at the meeting.

8

going on in [Plaintiff's] . . . life that were challenging," and that may have resulted in Plaintiff's "atypical" behavior, "[s]o [he] . . . had th[e] session." *Id*. at p. 11, ll. 11-12, 22. "Concerns" about Plaintiff's performance were "specifically mentioned." *Id*. at p.11, ll. 23-24. Plaintiff was "[a]sked . . . specifically about . . . anything that he had going on that he could identify that was causing the distraction" at work. *Id*. at p. 12, ll. 2-4. Although Plaintiff "committed to . . . do better," *id*. at p. 12, l. 7, "[o]ver the course of the next few months, . . . repeated events continued to happen," *id*. at p. 12, ll. 13-15.

"[I]n early September at some point," *id*. at p. 12, ll. 18-19, Vance "received a number of additional complaints from . . . Bell," *id*. at p. 12, ll. 18-21. Vance told Crain that these "continued issues," Pl.'s Resp. Ex. 2 (Doc. No. 43-2) at p. 4, l. 11, were "areas of concern and repeated events," *id*. at p. 4, ll. 12-13, and that "[t]hey seemed to be escalating over time instead of diminishing," *id*. at p. 4, ll. 13-14. Crain decided that it was "'time to let [Plaintiff] . . . go.'" Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 12, l. 25. Crain made the final decision to terminate Plaintiff's employment. *See id*. at p. 10, ll. 18-20; *id*. at p. 13, ll. 20-21 ("my determination was it was time for us to terminate his employment"). Vance also participated in making the decision. *See* Pl.'s Resp. Ex. 2 (Crain's Dep.) (Doc. No. 43-2) at p. 4, ll. 4-6.

Plaintiff was fired on September 8, 2017, for "[e]xcessive tardiness and neglect of duties." *See* Def.'s Mot. Ex. 3 (Employee Separation Report) (Doc. No. 35-3) at 1. At the termination meeting, attended by Plaintiff, Bell, and Vance, Vance told Plaintiff that he was being fired "'for performance issues.'" Pl.'s Resp. Ex. 2 (Crain's Dep.) (Doc No. 43-2) at p. 15, ll. 11-12. Vance stated, "'That's probably the biggest thing. I know that we

9

had to go back behind you to clean up some stuff and fix some issues,'" like "'Whole Foods in Tulsa.'" *Id*. at p. 15, ll. 12-14, 16. According to Plaintiff, this was the first time he had heard about "providing the wrong information to Whole Foods." Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc No. 43-1) at p. 39, ll. 5-6. Vance also told Plaintiff at that meeting, "'There's a couple of other little issues that began. Number of hours worked and things like that compared to everybody else, and just being fair about that and looking at how many hours Casey puts in versus you.'" Pl.'s Resp. Ex. 2 (Crain's Dep.) (Doc No. 43-2) at p. 18, ll. 19-23.

According to Defendant, Crain based his decision on "events that occurred over maybe a nine- or ten-month period of time," Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 13, ll. 1-2, involving Plaintiff's actions in "selectively follow[ing] the guidance of his management team," *id*. at p. 13, ll. 5-6. *See* Pl.'s Resp. Ex. 2 (Crain's Dep.) (Doc. No. 43-2) at p. 11, ll. 15-16 ("It was not a single event of any kind that I based my decision on."); Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 13, ll. 19-21 ("after considering all the different variables . . . my determination was it was time for us to terminate his employment"). Among other things, Plaintiff had had issues with "the daily service task tickets," Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 13, l. 8, "the maintenance of" his "vehicle that he would let slide for weeks," *id*. at p. 13, ll. 9-10, and "showing up to work on time." *Id*. at p. 13, ll. 10-11. Crain "did not independently . . . verify" Vance's and Bell's reports about Plaintiff's performance. Pl.'s Resp. Ex. 2 (Crain's

Dep.) (Doc. No. 43-2) at p. 11, ll. 22-23.[10] Rather, he "relied on" and "trust[ed]" his "management team that analyze[d] and provide[d] [the] information." *Id*. at p. 11, ll. 23-24; *see also id*. at p. 12, ll. 14-15 ("I relied on them for all issues").[11]

Plaintiff "fe[lt] like [he] . . . was singled out" for termination, Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 3, l. 18, "because they were trying to get rid of . . . [him]," *id*. ll. 20-21, after he "started complaining that . . . they were not paying [him] legally," *id*. at p.3, ll. 23-25. No other technician "was receiving write-ups," *id*. at p. 4, ll. 9-10, or "any type of verbal warning for coming in late," *id*. at p. 4, ll. 12-13, or "for . . . not getting their . . . truck report in right at the lst," *id*. at p. 4, ll. 14-15.

## DISCUSSION

The FLSA make it unlawful "to discharge . . . any employee because such employee has filed any complaint" about his rights under the FLSA, including his right under that Act to compensation for time worked in excess of forty hours per week.[12] 29 U.S.C. § 215(a)(3); *see Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004)

---

[10] Vance likewise did not independently investigate Bell's reports about Plaintiff's performance. *See* Pl.'s Resp. Ex. 3 (Deposition of Greg Scott Vance) (Doc. No. 43-3) at p. 2, ll. 19-22.

[11] Crain also believed that Plaintiff had exercised "poor personal judgment," Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 14, l. 19, and that his "lack of respect for his direct supervisor, . . . McLoud," *id*. ll. 23-23, "may have been contributing to performance issues," *id*. at p. 14, ll. 21-22.

[12] *See* 29 U.S.C. § 207(a)(1) ("[N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.").

("[A]n employee's request for overtime wages is a protected activity in the form of an unofficial assertion of FLSA rights."). "'[W]hether or not other grounds for discharge exist,'" a termination is deemed actionable under the Act "[w]hen the 'immediate cause or motivating factor of [the] discharge is the employee's assertion of statutory rights.'" *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984) (internal quotation marks omitted).[13]

FLSA retaliatory discharge claims based on circumstantial evidence are reviewed "under the *McDonnell-Douglas* analytical framework." *Winters v. Bd. of Cty. Comm'rs of Muskogee Cty.*, 633 F. App'x 684, 686 (10th Cir. 2015) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208 (10th Cir. 1997)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Pacheco*, 365 F.3d at 1206. Under this three-pronged framework, "Plaintiff must initially establish a prima facie case of retaliation" by showing "that: (1) he engaged in protected activity; (2) he suffered an adverse action; and (3) a causal connection existed between the protected activity and the adverse action." *Winters*, 633 Fed. App'x at 686 (citing *Richmond*, 120 F.3d at 208-09); *see Conner*, 121 F.3d at 1394.

---

[13] "*Love*'s 'motivating factor' test is equivalent to the 'but for cause' test, so that the discharge is unlawful only if it would have occurred *but for* the retaliatory intent." *Conner v. Schnuck Mkts., Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997); *see also Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) (explaining "that a plaintiff making a retaliation claim [under Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"). "The evidence of but-for causation 'must be based on more than mere speculation, conjecture, or surmise.'" *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

12

If a plaintiff establishes the elements of his or her prima facie case, "the burden of production shifts to the employer to offer a legitimate non-retaliatory reason for the adverse employment action." *Pacheco*, 365 F.3d at 1206. If the employer does so, the "ultimate burden" "shifts back to the employee to show genuine issues of material fact exist regarding whether the employer's proffered reason is unworthy of credence." *Id.* at 1207.

In its Motion, Defendant has argued that Plaintiff has failed to establish the first and third elements of a prima facie case for retaliation.[14]

A. *Whether Plaintiff Engaged in Protected Activity by Filing a Complaint*

Defendant has first argued that Plaintiff cannot show that he engaged in a statutorily protected activity—or, as in this case, that Plaintiff cannot show that he "filed any complaint." 29 U.S.C. § 215(a)(3). FLSA complaints may be oral or written and need present no more than an "'unofficial assertion of rights . . . at work.'" *Winters*, 633 F. App'x at 690 (quoting *Love*, 738 F.2d at 387). But it must be clear that a person is invoking rights protected by the FLSA. As the Supreme Court has explained, "'filing' is a serious occasion, rather than a triviality. As such, the [statutory] phrase 'filed any complaint' contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011). Thus, "[t]o fall within the scope of the

---

[14] There can be no dispute that the second element is met: "[Plaintiff's] termination constituted an adverse employment action." *Pacheco*, 365 F.3d at 1207; *see id.* at 1206 ("An adverse employment action is a detrimental change in the terms or conditions of employment, such as termination.").

13

antiretaliation provision," the "complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id*.

Plaintiff acknowledges that he never talked with Crain or with Vance about his entitlement to overtime pay. *See* Def.'s Mot. Ex. 4 (Doc. No. 35-4) at 6, ll. 12-15; *id*. at p. 7, ll. 6-8. According to Plaintiff, however, he first engaged in protected activity in "late 2016, probably," by raising Defendant's failure to pay overtime with McLoud and Bell. Pl.'s Resp. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 8, l. 21. But Plaintiff's descriptions of these conversations make clear that, while he expressed disagreement with the lack of overtime pay, he did not request any relief. *See id*. at p. 8, ll. 18-19, 21-22 (Plaintiff stating he "wasn't really complaining . . . about . . . overtime," but "it was really more [that he, McLoud, and Bell were] . . . just talking about [their] . . . pay."); *id*. at p. 8, l. 21 ("it was really more of [McLoud] and [me] just talking about our pay"); *id*. at p. 37, ll. 21-23 ("I just simply told . . . [Bell] that . . . they were not paying legally, and I explained why."). He acknowledges that, in fact, Plaintiff and McLoud "weren't talking as . . . supervisor and employee. [They] . . . were basically talking as friends." Def.'s Mot. Ex. 4 (Pl.'s Dep.) (Doc. No. 35-4) at p. 4, ll. 16-18; *see also id*. at p. 4, ll. 18-19 ("he was blowing off steam and . . . I guess I was blowing off steam").[15]

---

[15] Plaintiff states that he believed that McLoud and Bell, who attended the weekly management meetings, "would take the issue up the chain of command." Pl.'s Resp. (Doc. No. 43) at 6; *see id*. Ex. 1 (Pl.'s Dep.) (Doc. No. 43-1) at p. 38, ll. 13 (McLoud "did tell me, on a couple of occasions, that he has talked to Greg."); *id*.at p. 38, ll. 2-4 ("I always figured that [Bell] . . . was taking [it] up the chain of command because he always said that

14

The FLSA's "central aim . . . was to achieve . . . certain minimum labor standards." *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 292 (1960). To further this objective, the FLSA as "a remedial statute . . . must not be interpreted or applied in a narrow, grudging manner." *Brennan v. Dillion*, 483 F.2d 1334, 1337-38 (10th Cir. 1973) (internal quotation marks omitted). Even so, as the Supreme Court has cautioned, an employee's complaints must be capable of putting his or her employer "on notice," so that the employer will not "be left in a state of uncertainty about whether an employee . . . is in fact making a complaint about an [FLSA] violation or just letting off steam." *Kasten*, 563 U.S. at 13-14.

After viewing the record in Plaintiff's favor, the Court finds no evidence has been presented that Crain, the final decisionmaker, knew about Plaintiff's complaints at the time he terminated Plaintiff's employment.[16] "[I]t is difficult to see how an employer who does not . . . know an employee has made a complaint could discriminate *because* of that complaint." *Id*. Moreover, no evidence has been presented from which a factfinder could

---

. . . that's what he does."). Yet, when Plaintiff received no response, he took no further action.

[16] Crain was asked the following questions during his deposition, and he gave the following answers:

> Q Was any overtime—did any overtime consideration or issue play any part at all in your decision to terminate [Plaintiff's] . . . employment?
>
> A Absolutely none.
>
> Q How can you be sure?
>
> A Because I didn't even know about it. . . .

Def.'s Mot. Ex. 2 (Crain's Dep.) (Doc. No. 35-2) at p. 18, l. 24 to p. 19, l. 4.

15

properly infer that a reasonable employer in Defendant's circumstances otherwise would have had fair notice of Plaintiff's assertion of rights protected by the FLSA. Plaintiff's comments to and conversations with McLoud and Bell lack the "degree of formality" that would give "fair notice" that Plaintiff was lodging a "clear and detailed" FLSA complaint. *Id*. at 14. Accordingly, the Court concludes that Plaintiff has not put forth evidentiary material that would create a genuine dispute of material fact as to the first element of Plaintiff's prima facie case. The Court thus need not consider Defendant's argument regarding the third element (causation) of the prima facie case.

  B. *Whether Plaintiff May Nevertheless Show Retaliatory Discharge by Establishing Subordinate Bias*

Plaintiff has argued that even if "he never personally told either Crain or Vance about his complaints," he "can still prevail in this case" because McCloud and Bell "were motivated" by "retaliatory animus against" him and it was this subordinate bias that tainted Crain's decision to terminate Plaintiff. Pl.'s Resp. at 25-27.

Plaintiff's "subordinate bias" theory arguably implicates the "cat's paw" and/or "rubber stamp" doctrines. *See E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 421-22 (2011). "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *BCI Coca-Cola Bottling Co*., 450 F.3d at 484. The "rubber stamp" doctrine, on the other hand, "refers to a situation in which a decisionmaker gives perfunctory approval for an adverse

employment action explicitly recommended by a biased subordinate." *Id*. (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 (4th Cir. 2004)); *see Hamby v. Associated Ctrs. for Therapy*, 230 F. App'x 772, 780 (10th Cir. 2007); *see also Staub*, 562 U.S. at 421 (holding that an employer is liable under USERRA if supervisor commits act based on discriminatory animus that is intended to cause, and does in fact cause, adverse employment action). Under either theory, an employer "'may be held liable for a subordinate employee's prejudice even if the [decisionmaker] . . . lacked discriminatory intent.'" *BCI Coca-Cola Bottling Co.*, 450 F.3d at 485 (quoting *English v. Colo. Dep't of Corr.*, 248 F.3d 1002, 1011 (10th Cir. 2001)); *see Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015) ("[A]n employer who acts without discriminatory intent can be liable for a subordinate's discriminatory animus if the employer uncritically relies on the biased subordinate's reports and recommendations in deciding to take adverse employment action.").

Even assuming that both Plaintiff and Defendant had made their initial showings, such that the third-prong inquiry was before the Court,[17] and further assuming without deciding that FLSA liability can be shown under these doctrines,[18] to survive summary

---

[17] *See Pacheco*, 365 F.3d at 1207 (noting that when the burden shifts back to the plaintiff, the plaintiff "can produce direct evidence of retaliation or other evidence showing the employer's proffered non-retaliatory reasons for the adverse action were pretextual"); *BCI Coca-Cola Bottling Co.*, 450 F.3d at 484, 488-93 (evaluating plaintiff's subordinate bias claim as part of the plaintiff's burden to show that defendant's proffered reason is unworthy of credence under the third prong of *McDonnell Douglas*).

[18] *See Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1137 (10th Cir. 2013) (noting that the Tenth Circuit and Supreme Court have applied a subordinate bias theory of liability in various employment-discrimination contexts).

judgment when a retaliation claim is based on a "subordinate bias" theory "the plaintiff must establish that there is a genuine issue of material fact as to (1) the retaliatory animus of the subordinate, and (2) whether the subordinate's animus translated into retaliatory actions that caused the decisionmaker to take adverse employment action." *Id*. at 515. Thus, Plaintiff's first task is to "establish a genuine issue of material fact concerning the bias of the subordinate." *BCI Coca-Cola Bottling Co.*, 450 F.3d at 488-90; *see also id.* at 484 (requiring plaintiff to "make. . . a factual showing that [the identified influential subordinate] harbored racial animus toward black employees"); *accord English*, 248 F.3d at 1011; *Hamby*, 230 Fed. App'x at 780.

The Court finds, however, that Plaintiff has not shown a genuine dispute regarding discriminatory (or retaliatory) bias on the part of any subordinate who was aware of Plaintiff's complaints about overtime compensation and upon whose comments and information Crain relied in terminating Plaintiff's employment. *See BCI Coca-Cola Bottling Co.*, 450 F.3d at 488. Plaintiff's testimony that McCloud and Bell knew that Plaintiff believed Defendant was violating the FLSA by failing to pay overtime is not sufficient to create a genuine factual dispute that McCloud or Bell was motivated to see Plaintiff terminated or otherwise retaliated against for that belief—to the contrary, Plaintiff's testimony indicates that McCloud and Bell agreed with Plaintiff. Absent evidentiary material that would create a jury question about McLoud's or Bell's discriminatory bias—which Plaintiff has not produced—the Court finds the "subordinate bias" theory provides no basis for relief in this matter.

CONCLUSION

Because summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp.*, 477 U.S. at 322, the Court finds Defendant is entitled to judgment as a matter of law on Plaintiff's FLSA retaliation claim.

Accordingly, the Court

(1) GRANTS Defendant's Motion for Partial Summary Judgment (Doc. No. 35); and

(2) ADVISES the parties that entry of judgment in favor of Defendant under Federal Rule of Civil Procedure 58 on this claim for relief will await resolution of Plaintiff's remaining claims.

IT IS SO ORDERED this 14th day of March, 2019.

*[signature]*
CHARLES B. GOODWIN
United States District Judge